## THE NATRONA.

### THE NO. 12.

District Court, E. D. Pennsylvania. February 3, 1928.

#### No. 121 of 1921.

Shipping ⬪⟋209(1½.)—Value of vessel in proceedings to limit liability, constructed for special purpose, and having no market value, held value to owner (Admiralty Rule 51).

Where, on shipowner's application under Admiralty Rule 51 for limitation of liability, vessel had no market price by reason of there being no market demand for it, because it was built by owner to meet his own special and peculiar needs, *held* that the cost of a new vessel,

less depreciation and plus the advantage of a vessel ready for use, which would be the value of the vessel to the owner, was the proper standard adopted in determining the value of the vessel.

In Admiralty. Libel by the Pennsylvania Salt Manufacturing Company, former owner of the Barge Natrona, against the Atlantic Refining Company, owner of Motor Launch No. 12, wherein respondent applied for limitation of liability. On exception to the commissioners' report. Exception dismissed.

Acker, Manning & Brown, of Philadelphia, Pa., for libelant.

Ira Jewell Williams, of Philadelphia, Pa., for respondent.

DICKINSON, District Judge. The conclusion reached is that the exceptions to the report of the commissioners should be dismissed.

#### Discussion.

Admiralty rule 51, with which this cause concerns itself, gave to the respondent two options. One was that of surrendering the offending vessel to the libelant, out of the sale of which to get so much of the damages due them as could be realized. The other was to pay into court or give bond to pay the damages up to the appraised "amount or value" of such vessel. The respondent elected to keep the vessel. The rule further provides for the appraisement of such "amount or value." The commissioners have fixed this "valuation" at the sum of $35,000, to which finding the respondent has filed exceptions.

We are indebted to the very clear analysis of counsel for the opportunity to say that the questions raised turn upon the "standard measure of value" applied to reach this appraisement. As viewed by the proctors for the respondent, the utmost right of the libelant was to have had the vessel sold and to have received (up to the limit of the award of damages) the proceeds of such sale. This, as counsel argue, is the equivalent of what is commonly called "the market value" of the vessel, and hence the liability of respondent is limited to such "market value," and the market price thus becomes the measure of the "appraised value" to be fixed.

We are in entire accord with this proposition, but it is to be observed that it is predicated upon the assumption that there is a market for what is to be thus priced. Law, in common with all human creations, has its limitations. Its intent is to give to every injured party redress in the form of damages. This can only be expressed in terms of money. If the damage is the loss of prop-

erty, then the attempt is to award as many dollars as is the equivalent of the "value" of that of which the injured party has been deprived. How shall this admeasurement be made? If the property destroyed had a "market value," as the phrase goes, then this is accepted as the measure of damage. This in damage cases has been settled for us in this district. The Van Brunt (D. C.) 3 F. (2d) 655.

We are in full accord with counsel that the like doctrine of the law applies to appraisements. It will be observed, however (as before remarked) that this is an "if" proposition. What is to be done "if" there is no market, and in consequence the thing to be "valued" has no market price? The answer in general terms is that we are then to apply the next best test of "value." There are few words in our language oftener used and more often misused than the word "value." Our minds and thoughts are so dominated by commercialism that value commonly means, as it necessarily sometimes must mean, commercial value, or a ratio of exchange, or the relation which the thing to be valued bears to other things in the marts of exchange. Price is such value expressed in terms of money. In other words, for how many dollars can the thing be exchanged? If there is a market, as before stated, in which like things are bought and sold, this supplies the answer to the question. This is based upon the presumption, resting upon reasonable expectation, that the person who is damaged by the loss of property can go into the market to replace what he has lost, if he is given the market price. What was the market price or market "value" of this vessel as of the date of the damage suffered by the libelant?

The respondent itself has supplied us with the surest grounds for the finding that this vessel had no market price, nor could it have any. Commercial value or market price is the resultant of, or the reaction from, the opposing forces of demand on the one hand and supply on the other. There was no market demand for such a vessel, for the simple reason that no one (other than the respondent) could have any possible use for her. She was built by the respondent at its own yard; according to its own design; and to meet its own special and peculiar needs. For this reason no one else had any need for her, nor could she be put to any use. We almost literally quote the expert witnesses for the respondent in saying that the only value in the market sense which she had was as junk. It is clear that their $6,500 valuation is not the market value of the vessel, but the market value of a mass of junk in the form of a vessel. The market they have in mind is of the mongoose variety. If we follow them into this imaginary market, we see that they have in mind a supposititious public sale. This is not a market. It is a mere figment of the imagination. Even if we accept this theory of valuation, we can suppose a sale at the knockdown price of $6,500 only by excluding the two bidders who would bid on this as a vessel. The others would be merely junk bidders. If we are to imagine a market, it must be one open to all bidders. Why, then, exclude the two?

We have already expressed our accord with the proctor for respondent in his view that the appraisement is a substitute for a sale. Assume, then, the claim pressed to judgment and a sale by the marshal or the trustee to whom the vessel had been conveyed. We can readily call up in our imagination such a scene and the actors in it. The junk dealers would be there with their $6,500 bid. Market price, however, is not made by the lowest bidder, but by the highest. The libelant would likewise attend the sale with the right to bid. Would the junk bid take the property? If it was outbid by the libelant, we would still have the property going at a bid of say $6,600. The respondent would likewise be at the sale with the right to bid. Imagine, as can readily be done, the position of this bidder. A vessel is being offered for sale, built in accordance with the bidder's own design, and adapted to meet all its purposes. We know it has need for such a vessel, and is desirous of having it because only a few months before it bid $47,000 for one identical with it. Where would it stop in its bidding? Any one would have a ready answer to the question. It would stop with a bid of $35,000, assuming this to be the cost of a new vessel, less depreciation and plus the advantage of a vessel ready for use. Your imaginary market thus supplies us with an imaginary market price of $35,000. The appraisement of $35,000 is thus vindicated on the respondent's own theory. To substitute an imaginary market for a real one is to take away all value as a guide which market price has. There is no pretense that "real values" and "market prices" are the same. Common speech recognizes a distinction between them. Every where you see advertisements—"Price $20.00, Real Value $33.00." A common boast of shoppers is that they have bought something at a price below its real value. Sellers are less given to boasting, but they doubtless might often make the like boast in reverse. The law does not accept "market price" as a guide because it is an infallible measure of "real value." The real reason it is accepted

as a test is that "market price" is the common judgment of what things are worth and what every one thinks may safely be assumed to be right. Furthermore (as already said), if one can go into the market to buy the very thing to be valued, market price is a measure of its value in money. An imaginary market lacks both these features.

We are not driven, however, to resort to fanciful theories or to conjure imaginary markets. The parties have had the benefit of the judgment of commissioners who brought to their task ripe experience and trained minds. They have dealt with the problem, and have treated and discussed it with notable clarity, and have applied to its solution the established principles of law. The thing to be here valued through the form of an appraisement had, at the time, no market price. He was, in consequence, per force unable to apply this test. The vessel was new, having been built about six months before, at a construction cost price of over $47,000, and was valued by the respondent at nearly $45,000 by being carried at that price on its books. Cost price by no means always measures market price, but always influences the latter, and in the end controls it, because, when the market price of anything falls below the production cost, the supply will cease, and not be resumed until the demand is sufficiently urgent to raise the market price to a profitable level. The commissioners, thus having no market price to guide them, applied the rule of the next best test, and, if this standard was right, no criticism is made of the conclusion reached. We think the standard adopted was that which the law approves.

The exceptions are accordingly dismissed, and an appropriate order may be submitted.