**In re Petition of BANKER'S TRUST COMPANY, Monsanto and Keystone Shipping Company, As Owners and Operators of the SS EDGAR M. QUEENY for Limitation of Liability.**

Civ. A. No. 75–364.

United States District Court,
E.D. Pennsylvania.

July 5, 1983.

---

James Palmer, Philadelphia, Pa., for St. Corinthos.

Timothy Fisher, Gouldsboro, Pa., and James Young, Philadelphia, Pa., for SS Edgar M. Queeny.

Ben F. Stahl, Jr., Philadelphia, Pa., for BP/Sohio.

## MEMORANDUM OPINION AND ORDER

WEINER, District Judge.

This action arises out of a collision between the SS EDGAR M. QUEENY (Queeny) and the ST CORINTHOS (Corinthos) which occurred on January 31, 1975 on the Delaware River near Marcus Hook, Pennsylvania. On February 7, 1975 the Queeny interests filed a petition pursuant to the Limitation of Liability Act, 46 U.S.C. § 183 *et seq.*, seeking limitation of or exoneration from liability arising out of the collision. On July 18, 1980, after a trial on damages, we entered judgment in favor of BP/SOHIO and against the Queeny interests in the amount of $16,188,531.00. We denied BP/SOHIO prejudgment interest.

Presented to this court are the following issues for determination: (1) the time from which prejudgment interest at the rate of 10.5% should run; (2) the rate for postjudgment interest; and (3) the value of the Queeny and her freight then pending.[1]

### PREJUDGMENT INTEREST

BP/SOHIO and Queeny have stipulated the dates from which interest should commence on each claim of BP/SOHIO. The parties agree that interest at 10.5% per year on every claim would total $8,606,556.[2] However, Queeny objects to the awarding of interest on the following items: II–6, II–7, II–8, II–9, II–10, II–12, and II–13. Those seven items total $4,278,747 in agreed damages, and the agreed interest on those

---

1. *Matter of Bankers Trust,* 658 F.2d 103 (3d Cir.1981).

This case which included sixty cases and 112 personal injury, property damage and other sundry matters was transferred to this court in December 1977. All the personal injury cases

have been resolved except one now on appeal (Chatterjee) and all of the property damage cases have now been resolved save this matter.

2. See Appendix A attached.

items would be $2,266,666. Queeny therefore contends that the sum of $2,266,666 should be deducted from the sum of $8,606,-556 (the interest on all items). Queeny argues that BP/SOHIO should be awarded $6,339,890 for prejudgment interest. We do not agree.

■ In admiralty cases, prejudgment interest serves "... to reimburse the claimant for the loss of use of its investment on its funds from the time of such loss until judgment is entered...." *Matter of Bankers Trust Co.,* 658 F.2d 103, 108 (3d Cir.1981). We entered judgment on July 18, 1980 in favor of BP/SOHIO and against the Queeny interests in the amount of $16,-188,531.00, but denied prejudgment interest. The Court of Appeals, finding that BP/SOHIO is entitled to prejudgment interest, remanded the case to us "for a determination of the time from which such interest should run." *Matter of Bankers Trust,* 658 F.2d 103, 112 (3d Cir.1981). Our judgment was based on the total of the items set forth on Appendix A attached hereto. The Court of Appeals did not direct us to determine which items should be awarded interest and which items should not. Our task is to determine "the time from which such interest should run." *Id.*

Since the parties have stipulated to the dates from which prejudgment interest should run as to each item of damage claimed by BP/SOHIO, we award prejudgment interest to BP/SOHIO in the amount of $8,606,556.00.

## POSTJUDGMENT INTEREST

BP/SOHIO argues that since its rate of return on investment has been 14.56% from the date of judgment on July 18, 1980, through the latter part of 1982, that it should be awarded postjudgment interest of 14.56% on the amount of $24,795,087, which amount includes the judgment of $16,188,-531 plus the prejudgment interest of $8,606,556. BP/SOHIO contends that its claim of postjudgment interest at the rate

of 14.56% is confirmed by the deposition testimony of Peter Stuart Hellman ("Hellman"), the manager of financial planning of Standard Oil Company, and treasurer of Sohio Pipeline, a wholly owned subsidiary of Standard Oil Company. Hellman testified that the total amount of interest that one million dollars, invested in July 1980, would have generated through August 31, 1982 is $308,815.49, which figure represents an annual return of investment of 14.56%. (Hellman Deposition, September 9, 1982, p. 13). Queeny does not disagree with Hellman's calculations, but Queeny argues that Hellman's sin is one of omission rather than commission. *Queeny Interests Trial Memorandum In Support Of Its Requested Findings Of Fact And Conclusions Of Law On Prejudgment Interest, Postjudgment Interest And The Value Of The Limitation Fund,* p. 6. Queeny claims that Hellman omitted the fact that both the judgment amount as well as the earned interest on that judgment are subject to taxes at the corporation's effective tax rate. Queeny submits the deposition of Richard R. Marmon ("Marmon"), assistant treasurer and manager of accounting for Chas. Kurtz & Co., Inc. Marmon used Hellman's calculations and applied the effective corporate tax rate derived from BP/SOHIO's annual reports.[3] (Marmon Deposition, November 29, 1983, pp. 8, 12, 13). Marmon testified that if BP/SOHIO had received a million dollars in July 1980, invested that fund at the interest rates set forth in their schedule, and had paid all taxes on that fund plus the interest derived, BP/SOHIO would have left on August 31, 1983 the sum of $548,606.67 in cash. (Marmon Deposition, pp. 20, 21). Marmon calculated that the simple interest figure on a million dollars to give BP/SOHIO that amount of net case is 6.74%. (Marmon Deposition, p. 24). Based on Marmon's testimony, Queeny now argues that postjudgment interest should be 6.74% rather than the 14.56% requested by BP/SOHIO. Interestingly, Queeny had previously argued, in a

---

**3.** The reports indicated an effective tax rate of 53% in 1980 and 52% in 1981 on the net income.

Memorandum filed with this court on August 11, 1983, that we should award postjudgment interest at a rate of 8.05%. (See Memorandum of Law in Opposition to the Motion of BP/SOHIO for an award of Prejudgment Interest in the Amount of $8,606,556 and Postjudgment Interest at 14.39% and in Support of the Queeny Interests' Motion for an Award of Prejudgment Interest in the Amount of $6,339,890 and Postjudgment Interest at 8.05%). In that memorandum, Queeny proposes that we adopt the approach toward postjudgment interest which was to become effective in the October 1, 1982 amendments to the Federal Statute on Postjudgment Interest, 28 U.S.C. § 1961. Queeny contends that under those amendments, the postjudgment interest rate would be determined to be 8.05%. (Memorandum pp. 7, 8). Queeny however recognized that this court is not bound by that statute since it was not in effect on the date judgment was entered in this case. Further, in light of the opinion of the Court of Appeals in this case, Queeny recognizes that there is a question whether this court will be bound even after the effective date of the amendments. (Memorandum, p. 8).

■ Each party has filed a convincing memorandum in support of its position, and the court is faced with the difficult task of determining the proper rate of postjudgment interest in this case. We recognize that 28 U.S.C. § 1961, which sets postjudgment interest in civil cases at the legal rate of interest in the state in which the district court sits, does not apply to admiralty cases. *Matter of Bankers Trust Co.*, 658 F.2d 103, 112 (3d Cir.1981). The rate of postjudgment interest in an admiralty case rests within the sound discretion of the district court. *Id.,* citing *Sound Steamship Lines, Inc. v. Gardner,* 356 U.S. 960, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958). In reconsidering our previous award of postjudgment interest at the rate of 6%, we find that we must increase that interest rate in order to properly compensate BP/SOHIO fully for its demonstrated loss.

■ The percentages for interest advanced by the witnesses for each party, 14.56% by BP/SOHIO and 6.74% by Queeny, reflect rates based solely on mathematical hypotheticals. We recognize that if each event theorized by each witness occurred, the rate proposed by each witness would probably be correct. However, there are always factors which cause theoretical equations to change. In our discretion we feel that a postjudgment interest rate of 10% will adequately compensate BP/SOHIO. We will enter judgment in favor of BP/SOHIO for postjudgment interest at the rate of 10% on the amount of $24,795,-087, which amount includes the judgment of $16,188,531 plus the prejudgment interest of $8,606,566.

## VALUE OF THE QUEENY

■ When the Queeny interests filed their petition for limitation of liability on February 7, 1975, they alleged that the value of the Queeny was not more than $11,-000,000 plus pending freight of $269,501. At the trial, the Queeny interests called as their witness Robert Pierot who testified that the fair market value of the Queeny prior to collision was $11,000,000. Documentary evidence introduced at trial indicated that the Queeny had suffered damages as a result of the collision in the amount of $1,305,804 (Exhibit C–121). Since the limitation value is the value after the casualty, *Norwich & New York Transp. Co. v. Wright,* 80 U.S. 104, 20 L.Ed. 585 (1871); *Petition of Bloomsfield S.S. Co.,* 422 F.2d 728 (2d Cir.1970), the Queeny interests claim that the net value of the Queeny was $9,694,196, plus the pending freight of $269,501, or a total value of $9,963,697.

■ BP/SOHIO begins its argument with the rule of law for the measure of damages in the case of the total loss of a vessel. The rule is that damages are measured by the market value, if it has a market value, at the time of destruction. *Standard Oil of New Jersey v. Southern Pacific Co.,* 268 U.S. 146, 155, 45 S.Ct. 465, 466, 69 L.Ed. 890 (1925). "[C]ontemporary sales of like property in the way of ordinary business, as

in the case of merchandise bought and sold," is a means of measuring market value. *Id.* If there is no market value due to the lack of contemporary sales of like property, "other evidence is resorted to." *Id.*

Before resorting to other indicia of value, "the first search is for contemporaneous sales of comparable vessels." *Barton v. Borit,* 316 F.2d 550, 552–553 (3d Cir.1963). "[W]hen there is evidence of a number of sales on an open market of similar vessels the prices paid would set the limits of valuation to which the court must adhere, and resort to other indicia of value is not warranted." *Id.* at 553 (citing *Texas Co. v. R. O'Brien & Co.,* 242 F.2d 526, 527 (1st Cir. 1957). "Only if it should appear that there was no market [for vessels similar to the Edgar M. Queeny] or there were so few sales of like (ships) that it could not be predicted with any assurance that the prices paid would be repeated in a postulated sale of the (ship) in question, may resort be had to other relevant indicia of value such as replacement cost appropriately deducted." *Id.* (citing *United States v. Eastern S.S. Lines,* 171 F.2d 589 (1st Cir.1948).

■ If there is no market value, determination of value is somewhat flexible. "There is no one fixed basis which is decisive where a free and open market for such ships does not exist to establish fair market value. Rather, the basis of valuation is a composite one which gives an end result in each instance approximating actual value as closely as possible." *Ozanic v. United States,* 165 F.2d 738, 740 (2d Cir.1948) (citing *The Hisko,* 2 Cir.1931, 54 F.2d 540). The types of evidence looked to for the valuation of a vessel for which there is no established market value include "the opinion of marine surveyors, engineers, the cost of reproduction, less depreciation, the condition of repair which the vessel was in, the uses to which it can be put, the amount of insurance that the underwriters have issued, and the like." *Sawyer, Inc. v. Poor,* 180 F.2d 962, 963 (5th Cir.1950).

It is BP/SOHIO's argument that there was no ready market for a vessel like the chemical tanker Queeny and therefore the court should resort to evidence other than market value. They would have the court use the insurance value placed on her as an approximation of her replacement cost, that value being $20 million, averaged together with various estimates of the cost to replace the vessel taking appropriate depreciation into account. It is their argument that the average results in an estimated value of $26,859,501.

This court notes that neither party has started with the statute controlling the question of valuation which states, in pertinent part:

> The liability of the owner of any vessel ... for any loss, damage, or injury by collision ... done, occasioned or incurred, without the privity or knowledge of such owner or owners, shall not ... exceed the amount or value of the interest of such owner in such vessel, and her freight then pending. 46 U.S.C. § 183(a).

*Standard Oil Co. of New Jersey v. Southern Pacific Co., supra,* discussed valuation for the purpose of calculating collision damages rather than establishing a limitation fund. We repeat the rule of law we earlier set out on the issue of limitation value. "The limitation value (is) the value after collision" meaning "the sound value minus the cost of collision repairs." *Petition of Bloomfield Steamship Co., supra,* at 735, (citing *Norwich & N.Y. Transportation Co. v. Wright,* 80 U.S. (13 Wall.) 104, 20 L.Ed. 585 (1871)). "There do not appear to be any special limitation rules applicable to the vessel valuation problem." Gilmore and Black, *The Law of Admiralty,* § 10–32 (1975). Because "value" is not easily ascertained, and the rule set out under *Standard Oil* most clearly, to the extent possible, establishes how this court can find market value, we shall use *Standard Oil* as a guide to determine the value of the Queeny after the collision.

■ During the previous hearing, the issue argued before the court was that of limitation. The Queeny interests have moved to exclude all evidence other than evidence presented during that limitation hearing. This court has orally denied the

motion and reaffirms that denial since we are required to examine all relevant evidence pertaining to the ship's value.

■ The Queeny interests have submitted the deposition of Robert J. Pierot for proof of a number of sales on an open market of a similar vessel. In his deposition, Mr. Pierot states that there were at least three American flag tankers the size of the Queeny available for sale in the range of 37,000 deadweight tons in February 1975. They were the turbine tankers THETIS, SISTER KATINGO and ACHILLES. Of those, only the SISTER KATINGO and the THETIS were sold. The SISTER KATINGO was sold for $4.25 million and the THETIS was sold for $4.8 million. He did not testify to the dates on which they were sold.

Karl Richard Kurz, vice-president of Keystone Shipping Company, also was deposed. He is in charge of the function of traffic and chartering for Keystone. His department charters space on the Queeny. It was his testimony that, besides the above-named available ships, the EAGLE LEADER, a sistership of the Queeny, and the ERNA ELIZABETH were available at the relevant time. It was his opinion that the THETIS could have been converted to a product carrier for a cost of approximately $7 million and that the SISTER KATINGO could have been converted for $7 million as well. He stated that the EAGLE LEADER was available for sale for around $7 million and would have cost $4 million to convert. The conversion would have included the installation of deepwell pumps, double bottoms in the center tanks and conversion of the tanks themselves. Mr. Kurz did not testify that the EAGLE LEADER had, in fact, been sold at that time for that price.

Mr. Kurz testified that it would take approximately three years to build a new ship but only about five and one half months to convert the THETIS to a ship similar to the Queeny. He further testified that it would have cost more than twice as much to build a new ship than to purchase and convert an existing ship.

J.D. Van Rynbach, a consulting naval architect, marine engineer and marine surveyor, was also deposed. He was asked by the attorneys for Bankers Trust Company to prepare an estimate for the cost of converting a tanker to a chemical carrier. It was his opinion that such a conversion would have cost $7.9 million in 1975. The conversion was based on the THETIS whose purchase price in 1975 was $4.8 million. The Queeny interests argue that the THETIS, then, was available in February 1975 at the total cost of $12.7 million and that this court could conclude that the market value of the Queeny at the relevant time was $12.7 million.

The Queeny interests have also offered the deposition of Walter J. Neal, Jr., an employee of Keystone Shipping Company. He is a manager of special projects in the engineering department of Keystone where his primary work has been in new construction, conversion and modification of ships with high concentration in the area of the cargo systems and containments in tankers. He categorized the Queeny as a special products carrier. Since 1975 Keystone has done a single "jumbolized conversion." This means utilizing the stern section of an existing ship and rebuilding the entire hull and cargo systems and all other features making up the forward part of the ship. This type of conversion was performed on the special products chemical carrier the CHILBAR.

Mr. Neal testified that a jumbolized conversion is not the same type of construction project as a conversion as described by Mr. Van Rynbach because the former is a "new construction-type product and the latter is the converting of an existing ship. It was his opinion that the conversion proposed by Mr. Van Rynbach was feasible, i.e. to convert an existing tanker to a cargo carrier equivalent to the Queeny. He was also of the opinion that the price estimate was high.

BP/SOHIO took a different approach to evidence supporting its view of valuing the Queeny. It is their premise, as stated earlier, that because there were no contempora-

neous sales of like vessels, reference to the used vessel market is not possible. They have offered the testimony of Dr. Kenneth Fisher, President of Fisher Maritime Transportation Counselors, Inc. His career has been directed to ship construction, pricing and design. His 1972 doctoral thesis dealt with the application of engineering economics to ship design including what he terms "optimization concepts." Dr. Fisher was asked to report to BP/SOHIO's attorneys on the cost of replacing the Queeny both if the ship were delivered January 1975 but ordered three years earlier and if the ship were ordered January 1975 and delivered three years later. His detailed analysis led him to the conclusion that a ship delivered in January 1975 would have cost $28.2 million plus or minus $3.4 million and that a ship ordered in January 1975 and delivered three years later would have cost $37.4 million plus or minus about $3.7 million.

Because the Queeny was five years old at the time of the accident, he then testified to allowance for depreciation. He noted that depreciation in this sense means the cost of bringing the five-year old Queeny up to the point where it would have the same expected useful life as a brand new ship. This would cost no more than $.75 million.

In explaining his preference for looking at a replacement ship as though it were ordered in 1975 and delivered three years later, what he terms "late replacement," he felt he had addressed the possibility that had the Queeny been a total loss, the owners would have had to go out and order another ship. He recognized that during the time the ship was being built, the owners would have encountered many additional costs to continue to serve the market. Considering all of these factors together, Dr. Fisher was of the opinion that the "late replacement" cost represents a minimum value to the owners.

Although Dr. Fisher's testimony and report appear thorough and of high quality, the court is reluctant to rely on the evidence of the cost of reconstructing a new ship for the purpose of determining the Queeny's "sound value." It is obvious to

this court, and probably to all the parties to this action, that "value" is difficult to determine. Another court faced with the problem of valuing a vessel had this to say:

There are few words in our language oftener used and more often misused than the word 'value.' Our minds and thoughts are so dominated by commercialism that value commonly means, as it necessarily sometimes must mean, commercial value, or a ratio of exchange, or the relation which the thing to be valued bears to other things in the marts of exchange. Price is such value expressed in terms of money. In other words, for how many dollars can the thing be exchanged? If there is a market, as before stated, in which like things are bought and sold, this supplies the answer to the question. This is based upon the presumption, resting upon reasonable expectation, that the person who is damaged by the loss of property can go into the market to replace what he has lost, if he is given the market price. What was the market price or market 'value' of this vessel as of the date of the damage suffered by the libelant?

The Natrona, 25 F.2d 507, 508 (E.D.Pa. 1928). "[W]here ... reconstruction cost is out of all proportion to market value, it is quite proper to disregard [reconstruction cost] evidence entirely." The Steel Inventor, 36 F.2d 399, 400 (S.D.N.Y.1929). Of course, this formulation does not solve the initial inquiry of what is market value.

This court finds that had the shipowners been faced with the immediate loss of the Queeny in February 1975, the most practical solution and most likely response, would have been to immediately purchase a tanker of similar specifications and convert it to a chemical carrier. The total cost will be this court's finding of market value. The court will therefore turn to the evidence produced by BP/SOHIO with regard to the cost of taking that step. It is this court's determination that such a step essentially indicates the "sound value" of the Queeny.

Both parties agree that the THETIS was available at the relevant time. Although it

was later sold for $4.8 million, this court finds that the shipowner would have paid the $7 million asking price due to the urgent need involved. The 16 year old vessel would then have gone through fairly significant changes to bring it up to the level of usefulness of the 5 year old Queeny. As stated earlier, the Queeny interests have offered testimony that the conversion would have cost $7.9 million. BP/SOHIO contest this figure as severely underestimated and have offered the testimony of Joseph E. Manna, a marine engineer-consultant who reviewed Mr. Van Rynbach's report.

In Mr. Manna's view, in order to achieve a value similar to that of the Queeny, far more work would have been required of the THETIS than suggested by Mr. Van Rynbach. Mr. Van Rynbach had failed to include the cost of upgrading the hull and machinery. In sum, Mr. Manna concluded that the cost of converting the THETIS would be approximately $16.4 million which is $8.5 million more than the Van Rynbach estimate. If this court were to adopt that report in full, the total price for the THETIS would have been $23.4 million.

In a later deposition Dr. Fisher testified that the Van Rynbach/Neal approach and the Manna approach do not go far enough considering the need for reliability when the owner is planning to carry chemicals. In his opinion it would cost $2 million more than suggested by Mr. Manna to make the conversion more realistic and more up to the standards required of a chemical carrier. This would mean a total cost of $25.4 million.

The difficulty of the court's task is aggravated by the conflicting testimony even as given by BP/SOHIO's own witnesses. As we have repeated too many times already, the court is attempting to determine the value of the vessel. Testimony of cost, whether in terms of replacement, like-kind purchases, and/or conversions, merely evidence value. Somewhere among the totals presented to the court is the value of the Queeny. While the court finds that the figure of $12.7 million is too low because it fails to account for significant modifications necessary to turn a vessel like the THETIS into one with sufficient tank integrity, it is also the finding of this court that the proposed conversion cost totalling $25.4 million overestimates what the shipowners would have viewed necessary to convert the ship. Based on this finding, the court further finds that the value of the Queeny was less than $25.4 million. The court finds that the value of the Queeny at the time of the collision was $19.05 million. This represents an average of the high and low estimates of the parties. It is supported by the $20 million insurance value placed on the Queeny before the casualty. The sum of $19,050,000 will be reduced by the amount of repairs of $1,305,804. This figure of $17,744,196 will have added to it the pending freight of $269,501.[4] It is the finding of this court that the limitation fund is $18,013,697 based on the foregoing determinations of the value of the Queeny at the time of the collision and the proper adjustments to the value.

All that remains for decision is the percent of interest to be placed on the limitation fund. By order of this court, on February 7, 1980 a bond was posted for the value of the Queeny plus pending freight in the amount of $11,269,501. It is the Queeny interests' argument that this court is bound by Supplemental Rule F(1) of the *Federal Rules of Civil Procedure* to apply 6% annual interest to the fund. BP/SOHIO argues that interest on the fund should be accrued at market rates. They argue that equity requires accrual at market rate. They also argue that Supplemental Rule F(1) is not in accord with the Limitation of Liability Act, 46 U.S.C. §§ 183 *et seq.*, which again is an argument on the basis of equity.

Rule F(1) provides:

Rule F. Limitation of Liability

(1) Time for Filing complaint; Security. . . . The owner (a) shall deposit with the court, for the benefit of claimants, a

---

**4.** Both the freight pending and repair figures are uncontested.

sum equal to the amount or value of his interest in the vessel and pending freight, or approved security therefor, and in addition such sums, or approved security therefor, as the court may from time to time fix as necessary to carry out the provisions of the statutes as amended . . . The plaintiff shall also give security for costs and, if he elects to give security, for interest at the rate of 6 per cent per annum from the date of the security.

The court agrees that 6% interest calculated on the limitation fund is inequitable and limits this court's ability to carry our Section 185 of the Limitation Act which, like Rule F, states, in relevant part:

> The owner (a) shall deposit with the court, for the benefit of the claimants . . . such sums, or approved security therefor, as the court may from time to time fix as necessary to carry out the provisions of section 183 of this title. . . . 46 U.S.C. § 185.

In *In Re Kingston Shipping Co.,* (*The Capricorn*), 1983 A.M.C. 134 (M.D.Fla.1981), the court, after determining that the posting of a security bond that accrued interest at the rate of 6% was inequitable, solved the inequities by requiring the plaintiffs to deposit the value of the shipowner's interest into court rather than post a security bond. The Clerk was directed to invest the money "in a certificate of deposit or similar program in order to obtain the greatest interest available for the fund." *Id.* at 137.

■ As that court noted in its denial of plaintiffs' Motion for Reconsideration, "a limitation action always has been, and still remains, an equitable proceeding." *Id.* at 139 (citation omitted). This court agrees that there is no indication that Congress intended to limit the scope of the limitation court's equitable powers when it passed the 1936 Amendments of the Limitation Act. *Id.*

■ In *Complaint of Red Star Barge Line, Inc.,* 683 F.2d 42 (2d Cir.1982), the Court of Appeals determined that the 6% rate required by Rule F(1) applied to the security supplied prior to judgment. The court determined, however, that "as to the difference between $75,000 (the amount of the surety bond) and the ultimate $135,000 award (valuation), *i.e.* $60,000, the court was not bound to the 6% figure by 46 U.S.C. § 185 or by the Supplementary Rules. Rather, the court should have applied general principles as to prejudgment interest." *Id.* at 45 (citations omitted). The court remanded the case to the district court "for the exercise of its broad discretion in respect to the interest on the $60,000 awarded over the security furnished." *Id.*

These cases illustrate the need to resolve these essentially financial matters equitably and flexibly. This court will exercise its equitable powers and require payment of 10.5% per annum interest on the difference between the amount posted and the actual value for the period from February 1975 to July 1980. That is, 10.5% is awarded on the difference of $6,744,196 for the period between the posting of the security and the date of judgment. For July 1980 until the date the fund is distributed to claimants, interest will be applied at the rate of 10%.

This court, while not bound by the pre- and post-judgment interest rates applied to damages, has determined that such rates adequately account for the rate of interest the limitation fund would have accrued during these lengthy proceedings. Of course, the Queeny interests have had these monies available to them for this entire time and, assuming that it was prudently invested, they had the advantage of accruing at least this much interest on the undervalued portion of the fund. Therefore, no harm results in this court's efforts to establish a true value on the limitation fund and the court is satisfied that equity has been done.