KEYSTONE SHIPPING COMPANY, Appellant,

v.

The HOME INSURANCE COMPANY, Appellee.

No. 87–1321.

United States Court of Appeals, Third Circuit.

Argued Nov. 20, 1987.

Decided Feb. 18, 1988.

Rehearing and Rehearing In Banc Denied March 16, 1988.

Thomas H. Seus, Kelly, Harrington, McLaughlin & Foster, Philadelphia, Pa., for appellant; Donald M. Waesche (argued), Waesche, Sheinbaum & O'Regan, P.C., New York City, of counsel.

Raymond K. Denworth, Jr., James C. Ingram (argued), Peter Nordberg, Drinker, Biddle & Reath, Philadelphia, Pa., for appellee; Alan J. Rein, Killarney, Rein, Brody & Fabiani, New York City, of counsel.

Before SEITZ, HUTCHINSON and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

This is an admiralty case. It has its beginning in a January 31, 1975 allision in

which appellant Keystone Shipping Company's (Keystone) chemical carrier S.S. EDGAR M. QUEENY (QUEENY) struck the crude oil tanker S.T. CORINTHOS (CORINTHOS) on the Delaware River near Marcus Hook, Pennsylvania. At the time of the allision, the CORINTHOS was discharging a cargo of crude oil at the BP/Sohio terminal. The accident resulted in numerous death and personal injuries, extensive damage to the refinery and surrounding properties, pollution in the Delaware River, the destruction of the CORINTHOS and damage to the QUEENY.[1] The incident spawned more than a decade of litigation and eight previous appeals to this Court.[2]

Appellee, The Home Insurance Company (Home), is one of a number of insurance carriers who provided QUEENY marine insurance in varying amounts at various coverage levels. After protracted litigation which left a number of issues unresolved, all the QUEENY's insurers except Home agreed to pay B.P. Oil, Inc./Sohio Petroleum Company (BP/Sohio), the only remaining claimant, $30 million in full settlement.[3] Home refused to participate beyond $24.8 million. The other carriers went ahead and settled for $30 million, taking "loan receipts"[4] from appellant for $965,011.22. This represents Home's *pro rata* share of the settlement at the third excess policy level. Claiming Home had failed to meet an obligation to pay its share of a reasonable settlement, Keystone, for the benefit of the other contributing carriers, sought reimbursement from Home of the $965,011.22 evidenced by the loan receipts.[5]

The district court refused Keystone's claim, stating, "Home's refusal to pay the $965,000–odd dollars was a reasonable business decision based on an honestly held belief that the $30 million settlement was too high." Jt.App. at 28. Keystone appealed this order, contending the $30 million settlement was reasonable and Home had an obligation to pay its full share of any reasonable settlement.

The district court had jurisdiction of this claim under 28 U.S.C.A. § 1333 (West 1966). We have appellate jurisdiction over the district court's order absolving Home of any further obligation under 28 U.S.C.A. § 1291 (West Supp.1987).

■ Our scope of review with respect to Home's obligation to contribute toward the settlement is plenary. We review the district court's findings which underlie the determination that Home met its obligation to determine whether they are clearly erroneous.

■ We must reject Keystone's contention that Home had to contribute its full share of any reasonable settlement. Specifically, we hold that neither the insurance policies written in this case nor general law impose such an obligation upon Home, either as a co-insurer at the third excess level or as an underlying co-insurer at the lower coverage levels. A co-insurer like Home is not obliged to accept other co-insurers' evaluations of litigating prospects so long

1. A comprehensive recitation of the facts surrounding the accident appears in *In re Bankers Trust Co.,* 651 F.2d 160, 164–66 (3d Cir.1981), *cert. denied,* 455 U.S. 942, 102 S.Ct. 1436, 71 L.Ed.2d 653 (1982).

2. *In re Bankers Trust Co.,* 775 F.2d 545 (3d Cir.1985); *Bankers Trust Co. v. Bethlehem Steel Corp.,* 761 F.2d 943 (3d Cir.1985); *In re Bankers Trust Co.,* 752 F.2d 874 (3d Cir.1984); *Villaneuva Compania Naviera, S.A. v. Bethlehem Steel Corp.,* 729 F.2d 1450 (3d Cir.1984); *In re Bankers Trust Co.,* 688 F.2d 818 (3d Cir.1982); *In re Bankers Trust Co.,* 658 F.2d 103 (3d Cir.1981), *cert. denied,* 456 U.S. 961, 102 S.Ct. 2038, 72 L.Ed.2d 485 (1982); *In re Bankers Trust Co.,* 651 F.2d 160 (3d Cir.1981), *cert. denied,* 455 U.S. 942, 102 S.Ct. 1436, 71 L.Ed.2d 653 (1982); *In re Bankers Trust Co.,* 636 F.2d 37 (3d Cir.1980).

3. All dollar amounts except the amount in dispute are in round numbers. The difference between the rounded figure and the precise amount is immaterial to this dispute.

4. For a general description of the "loan receipts" see *infra,* at 183–84.

5. The Hon. Charles R. Weiner presided over the limitation of liability action and the corollary products liability suit until the settlement which resulted in the dispute before us. The Hon. Marvin Katz presided over the dispute over appellee's responsibility to fully participate in indemnifying the appellant.

as its own evaluation is not unreasonably low and it has acted in good faith in advancing and adhering to that evaluation in the absence of a contract which can be construed to impose such an obligation. Because the district court found that both the $30 million settlement and Home's evaluation of the litigating chances at $24.8 million were within the bounds of reason, and that Home's $24.8 million evaluation was not held and advanced in bad faith, we will affirm.

As bareboat charterer of the QUEENY, Keystone purchased, over and above a primary marine liability policy, four excess liability policies from various participating insurers. The total coverage available from all of these policies, including the primary policy, was $70 million. Home's responsibility as a co-insurer participating at the third excess level liability policy is the subject of this lawsuit. That policy provided $10 million in excess coverage over the primary coverage of $5 million, the first excess policy of $20 million and a second excess policy in the amount of $10 million. Home had underwritten twenty percent, or $2 million, of coverage at this third excess level. In addition, Home was the sole insurer at the fourth excess level in the amount of $5 million and had also underwritten ten percent ($2,000,000) of the fifth excess policy of $20 million. Home's co-insurers at the third excess level were Insurance Company of North America (25% or $2,500,000), Highlands Insurance Co. (20% or $2,000,000), St. Paul Fire & Marine Insurance (15% or $1,500,000), American International Group (10% or $1,000,000) and Reliance Insurance Co. (10% or $1,000,000).[6]

By August, 1985, all claims had been resolved except BP/Sohio's. Keystone still had $56.2 million coverage available from all its insurers, plus a $5 million fund paid to the insurers by Bethlehem Steel and two other products liability defendants against the insurers' promise to indemnify them from further liability in a related products liability action. A number of legal issues remained unresolved.

Into this sea of uncertainties the district court tossed an order requiring the insurers to post a $32 million security deposit. BP/Sohio's maximum claim then stood at $37 million, including accrued interest to date, and its settlement demand was $33.6 million.[7]

Settlement talks began in earnest. BP/Sohio became willing to close things out at $30 million. The others agreed, but Home balked beyond $24.8 million. Unwilling to litigate further, the other insurers put up Home's share of the settlement above $24.8 million, amounting to the $965,011.22 at issue here. The co-insurers accepted loan receipts from Keystone obligating it to bring suit in its name, as insured, against Home and to pay any funds recovered to the other insurers in accordance with their shares of liability under the third excess level policy. These loan receipts

---

6. These co-insurers are the real parties in interest. Pennsylvania apparently permits prosecution in the insured's name of actions to compel participating insurers to share in paying a settlement when, as here, the insured issues loan receipts to the insurers who paid. *See generally Watsontown Brick Co. v. Hercules Powder Co.,* 201 F.Supp. 343 (M.D.Pa.1962). Pennsylvania law controls the insurance issues in the case. *See Wilburn Boat Co. v. Fireman's Fund Ins. Co.,* 348 U.S. 310, 321, 75 S.Ct. 368, 374, 99 L.Ed. 337 (1955).

7. The $37 million figure for BP/Sohio's claim includes interest accrued to August, 1985 on BP/Sohio's full principal claim at the rate finally set in the Queeny litigation. The funds available in the insurers' hands or on deposit would, of course, themselves accrue interest in amounts likely to materially offset continuing accruals on the claim. The extent to which interest earned by the insurers' or the court's investment of the funds available for settlement would offset the fixed rate of interest established as a result of this litigation is not precisely predictable. Interest earned on settlement funds depends upon the skill of the investors, the movement of interest rates and factors affecting financial markets and the general economy. The district judge's order requiring the insurers to post $32 million dollars as security for Home's claim if they did not settle the litigation would have largely deprived them of the ability to manage the investment of the funds they had at risk in this litigation. Under normal insurance practices, such funds, while reserved, are not set aside in a separate fund held exclusively for the benefit of claimants.

provided that appellant's liability could not exceed its recovery.

The third excess level policy provided that the co-insurers shall be bound "severally but not jointly." Jt.App. at 210. The parties have agreed that it contained a provision entitled "Assistance and Co-Operation."[8] It read:

5. ASSISTANCE AND CO-OPERATION

The Underwriters [Home] shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceeding instituted against the insured but the Underwriters shall have the right and shall be given the opportunity to associate with the Insured or the Insured's underlying insurers, or both, in the defense and control of any claim, suit or proceeding relative to an occurrence where the claim or suit involves or appears reasonably likely to involve the Underwriters, in which event the Insured and the Underwriters shall co-operate in all things in the defense of such claim, suit or proceeding.

Jt.App. at 257.

Treating this proceeding under the loan receipts as if Keystone, the assured, is the real party in interest, appellant first argues:

Point I—An assured is entitled to settle a case rather than proceed to trial and to recover the amount of the settlement from its insurer if it can establish that it was potentially liable and the amount of the settlement was reasonable. The District Court erred in holding that the assured must prove that the insurer acted in "bad faith" in order to effect a recovery.

Appellant's Brief at p. 13.

The difficulty with this argument is that there is no single figure at which settlement is reasonable in the face of the litigating uncertainties. The best that anyone can do is to set a range of values which fall within the bounds of reason. The district judge did this when he found Home's $24.8 million evaluation reasonable and stated he could not find Home's co-insurers' $30 million evaluation unreasonable. Those findings are not clearly erroneous. There is no one reasonable man to whose objective state of mind we can refer this issue and the terms of the policy provide no method for resolving it. Because reasonable men may differ about the wisdom, on this record, of settling between $24.8 and $30 million, the strict objective standard Keystone advances fails as an analytic tool.

We believe the law of Pennsylvania, the governing jurisdiction, would not leave a recalcitrant insurer whose evaluation falls within the range of all reasonable settlements wholly free to escape payment of its portion of a reasonable settlement effected by its co-insurers. Strong policy reasons argue against granting an insurer that kind of arbitrary power. They include the policy in favor of settling litigation. *Pennwalt Corp. v. Plough, Inc.*, 676 F.2d 77, 80 (3d Cir.1982). To hold otherwise would encourage each co-insurer to ignore the common interest and hold out for an unreasonably low settlement, thereby profiting from its own recalcitrance. Where, as here, the contract does not expressly impose an obligation on one co-insurer to follow the others and the co-insurer who objects to the size of the proposed settlement nevertheless contributes to a settlement which is not unreasonably low, we agree with the district court that the co-insurers' obligation (an obligation whose existence on this record the parties concede[9]) is measured by good faith.

---

8. Mr. Denworth, counsel for Home, stated to the district court that the "Assistance and Co-Operation" clause was included in this policy despite its absence from that portion of the record containing the third excess policy. Jt.App. at 43–44. The clause was then handed to the court and admitted without objection. We have assumed that this clause, which appears in all of the other policies, is the clause to which Mr. Denworth referred to as being a part of the third level policy.

9. In their briefs and oral argument, the parties assume the existence of a duty on the part of Home, as co-insurer, to pay a share of this settlement pro-rata to the share of indemnity it underwrote in the third excess level contract. They do not refer us to the source of that duty. For reasons that follow in this opinion, we be-

This holding is consonant with existing Pennsylvania case law implying into Pennsylvania insurance contracts a duty that the insurer treat its insured fairly in negotiating and effecting settlements. *Cowden v. Aetna Casualty & Surety Co.*, 389 Pa. 459, 134 A.2d 223 (1957).[10] It is also consonant with this court's decisions extending that duty, via equitable subrogation, to primary carriers in their dealings with excess insurers. *See Puritan Ins. Co. v. Canadian Universal Ins. Co.*, 775 F.2d 76, 80 (3d Cir.1985); *United States Fire Ins. Co. v. Royal Ins. Co.*, 759 F.2d 306, 309 (3d Cir. 1985).

These cases differ from the one before us in several respects. First, they involve either a conflict of interest between an insurer and an insured or one between an excess carrier subrogated to the insured's rights and the primary carrier. This dispute is among co-insurers. The fact that Pennsylvania courts would act more favorably towards an insured in a dispute with his insurer because of their disparate bargaining power does not suggest they would be other than neutral in a dispute among the insurers themselves. *See, e.g., Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 503 Pa. 300, 307, 469 A.2d 563, 567 (1983) (court may consider disparate bargaining power when choosing to refuse enforcement of a clause of an insurance contract).

The second difference between this case and the Pennsylvania cases cited concerns the carrier's control over the litigation.

*Cowden, supra,* the seminal case, was an automobile insurance case. There, as is the practice in most liability policies, the insured expressly delegated control of the litigation to the insurance carrier. Here, however, the insurers had arguably delegated control of the litigation to the insured and had agreed to do no more than cooperate with it and possibly with each other. Assistance and Co–Operation Clause, Jt.App. at 257; *supra,* at 184. The ability of an insurance carrier to control the defense, either vis-a-vis the insured or other insurers, points in the direction of increasing its obligation to those who have no control over the course of litigation or its settlement.

The distinctions between these cases and the one before us pull in the direction of imposing no higher a duty than good faith here. Keystone, nevertheless, argues that we should apply a reasonableness test on this record. It contends that, when an insured seeks payment of a settlement within policy limits, an insurer should be accountable for its full *pro rata* share of the coverage unless the settlement was unreasonable. In other words, it says a different standard is appropriate when the insurer is asked, not to satisfy an excess judgment but only to pay an amount within the limits of its indemnity contract. One answer to that argument has already been given. Neither Home nor its co-insurers at the third excess level were unreasonable in their settlement evaluation. In addition, by

---

lieve some duty exists. *See* 8A J. Appleman, *Insurance Law and Practice* §§ 4921–4922 (1981). Without precisely pigeonholing the nature of its origin, we will therefore accept their invitation and assume a duty's existence without determining whether it arises out of obligation implied in contract, duties of contribution or equitable subrogation imposed by the law of restitution, or by a fictional duty constructed from the loan receipts.

We note that the contract does not contain any express contractual duty. There are analytic problems in applying principles of equitable subrogation if we ignore the loan receipts. The law of contribution is in a developing state. *See, e.g., Continental Casualty Co. v. Canadian Universal Ins. Co.*, 605 F.2d 1340 (5th Cir.1979), *cert. denied*, 445 U.S. 929, 100 S.Ct. 1317, 63 L.Ed.2d 762 (1980); *Employers Casual-*

*ty Co. v. Transport Ins. Co.*, 444 S.W.2d 606 (Tex.1969); *see generally* Restatement of Restitution §§ 81–85 (1937). The parties have not referred us to any Pennsylvania authority. The only Pennsylvania precedent we have found suggests, in a *dictum,* that the cause of action is predicated upon a contribution theory. *Sloat v. Royal Ins. Co.*, 49 Pa. 14, 18 (1865).

**10.** As recently as 1983, the Pennsylvania Supreme Court reiterated its adherence to this standard. *Reid v. Ruffin,* 503 Pa. 458, 463–65, 469 A.2d 1030, 1033–34 (1983). *See also Hall v. Brown,* 363 Pa.Super. 415, 526 A.2d 413, 415 (1987) (Pennsylvania Superior Court, citing *Cowden,* notes good faith test); *Shearer v. Reed,* 286 Pa.Super. 188, 428 A.2d 635 (1981) (Pennsylvania Superior Court rejects reasonableness test).

incurring the greater initial risk of not settling and so putting BP/Sohio to the test of establishing its full claim, Home itself incurred the risk of having to pay all of BP/Sohio's recovery over and above the settlement Home's co-insurers proposed.

We find it hard to conclude that Pennsylvania would impose on a co-insurer a greater obligation to his fellows than it does upon an insurer to its insured. This is particularly true where neither the co-insurer upon whom the obligation is to be imposed nor any of his fellows has a right to control the course of the litigation or the amount of settlement, but obtains from the insured no more than a promise of cooperation and assistance. Assistance and Co-Operation Clause, Jt.App. at 257; *supra*, at 184.

In the absence of controlling Pennsylvania authority, we believe this result is supported by reason. Co-insurers who participate in covering a risk are free to contract as they will with respect to their obligations *inter se*. The problems of disparate bargaining power are not as likely to be present among them as they are between insurer and insured. The imposition of an obligation of fair dealing among them does not deprive them of the freedom to contract by placing the responsibility for settlement decisions on one or more participating insurers. It does serve to discourage individual participating insurers from wholly ignoring the overall interest of the parties, as well as that of the judicial system, in fostering reasonable settlements.

Rejecting Keystone's argument that Home should be held for its full share of any reasonable settlement its co-insurers can effect, we turn to the situation as it appeared in August, 1985, in order to evaluate the district judge's finding that Home's refusal to pay its $965,011.22 third

excess level share of the $30 million settlement was a "reasonable business decision based on an honestly held belief that the $30 million settlement was too high." Jt. App. at 28.

Our review of the district judge's findings of fact is limited to a determination of whether they may be set aside as "clearly erroneous." Fed.R.Civ.P. 52(a); *American Home Prods. Corp. v. Barr Laboratories,* 834 F.2d 368 (3d Cir.1987). The record contains sufficient evidence to support them. The district judge's finding that an assessment of BP/Sohio's litigating chances at no more than $24.8 million was not unreasonable and was honestly held is not clearly erroneous.[11]

In evaluating Home's conduct, we must look at the overall picture in August, 1985 to determine what a co-insurer could honestly believe was a fair settlement. When the August, 1985 negotiations began, the underwriters, including Home, recommended to Mr. Young, chief counsel for the assured and for them, that he endeavor to settle the case for about $24.8 million. BP/Sohio countered with an offer of $33.6 million. When the other underwriters agreed to the $30 million compromise, Home refused to participate.[12]

In reviewing the settlement process, the district court focused on a number of factors from the earlier limitation proceedings in holding that Home acted reasonably when it chose to press for a more favorable settlement.

First, Home relied upon Mr. Young's representations that Keystone and its insurers might ultimately prevail in limiting liability to the value of the QUEENY. In *In re Bankers Trust Co.,* 651 F.2d 160 (3d Cir. 1981), *cert. denied,* 455 U.S. 942, 102 S.Ct. 1436, 71 L.Ed.2d 653 (1982), we held that the astern guardian valve evidence was

---

**11.** Our holding and the district judge's formulation of Home's duty in the dual terms of prudence and good faith may support the view that the distinction between good faith and reasonableness is largely illusory. *See, e.g., Buntin v. Continental Ins. Co.,* 525 F.Supp. 1077, 1081 n. 5 (D.V.I.1981); Keeton, *Liability Insurance and Responsibility for Settlement,* 67 Harv.L.Rev. 1136, 1140 (1954); Annotation, *Duty of Liability Insurer to Settle or Compromise,* 40 A.L.R.2d

168, 171 (1955). One court has held that an insurer's negligence will support a finding of bad faith. *Clark v. Interstate Nat'l Corp.,* 486 F.Supp. 145, 149 (E.D.Pa.), *aff'd,* 636 F.2d 1207 (3d Cir.1980).

**12.** Home did, however, contribute its $4.5 million portion of the second excess level.

insufficient to deny the QUEENY's claim for limitation. 651 F.2d at 173. Later, we ordered the district court to consider any other remaining issues on the limitation claim. *In re Bankers Trust Co.*, 761 F.2d 943 (3d Cir.1985). Mr. Young, in his letter dated May 17, 1985, stated to his clients that BP/Sohio's emphasis on the astern guardian valve in the first round of the limitation battle suggests that any remaining arguments were weak. Jt.App. at 216. Following a hearing on August 5, 1985, Mr. Young told his clients that the district court's representations at the hearing buttressed his belief that the remaining limitations issues would not be fruitful for BP/Sohio to pursue. Jt.App. at 222. The record supports the district court's finding here that Home reasonably relied upon its counsel's suggestions that Keystone might be able to limit its liability.

In the earlier proceedings, the district court held that the value of the limitation fund was approximately $18 million exclusive of interest. *In re Bankers Trust Co.*, 569 F.Supp. 386, 393 (E.D.Pa.1983). The court arrived at this figure by averaging the two parties' estimates of the QUEENY's value. *Id.* In the instant case, the district court found Home's insistence that the $30 million settlement agreement was excessive reasonable. In doing so, it noted that Keystone had offered evidence that the QUEENY's replacement value was only $7.6 million, not $18 million, as the district court found.

The district court also found that Home had an arguably tenable appellate argument, *viz*, that the trial court in the limitation proceedings abused its discretion in employing an averaging method to arrive at a value of $18 million for the QUEENY. Although we cannot and do not now rule on that methodology, neither can we conclude that the district court's finding on this point was "clearly erroneous" and that it

should carry no weight in the settlement evaluations. Accordingly, we agree with the district court's finding that Home was acting properly when it incorporated into its settlement calculations the possibility of reducing the limitation fund.

In holding that Home acted reasonably and in good faith when it decided not to participate in the $30 million settlement, the trial court also emphasized that Keystone may have been able to reduce the size of its obligation to BP/Sohio by *pro tanto* setoff of the monies already paid in settlement to other property, personal injury and death claimants. Had the district court ultimately allowed Keystone to limit its liability, BP/Sohio would have been entitled to only its *pro rata* share of the entire fund. Mr. Young calculated that the amount to be paid to BP/Sohio in that event would have been $19.7 million. Jt. App. at 218. The district court found that there was a substantial chance that the limitation fund would "be reduced *pro tanto* by the payment of other property damage claims or the death and personal injury claims or by both." Jt.App. at 37. Home properly believed the possibility that the limitation fund might be reduced should have been utilized as additional leverage to gain a more favorable settlement. We see no reason to disturb this finding.[13]

Keystone argues that the trial court improperly discounted the possibility of a large adverse verdict in the products suit. To insure a full recovery, BP/Sohio brought suit against Bethlehem Steel, General Electric and William Powell, the manufacturers of the vessel and its propulsion system. In settlement of its similar suit against the three products defendants, Keystone agreed to defend and hold harmless the three defendants in the BP/Sohio products liability suit.[14] Here, the district court found that Home acted properly

---

13. We are mindful of the fact that the Limitation of Shipowners' Liability Act provides differing standards for determining when a vessel owner may limit his liability. *Compare* 46 U.S. C.A. § 183(a) *with* 46 U.S.C.A. § 183(e) (West 1958). *See also* 3 A. Jenner, B. Chase, J. Loo & H. Prival, *Benedict on Admiralty* § 4–1 (7th ed. 1986).

14. In exchange, the three products defendants agreed to contribute ten percent of any judgment or settlement against Keystone in the limitations claim. The agreement limited the products defendants' contribution to $5 million. *See supra*, at 183.

when it discounted the potential of a sizeable recovery by BP/Sohio in the collateral products lawsuit. The court found persuasive the fact that the products defendants and Keystone had put a $5 million limit on their settlement agreement. Moreover, the court cited Mr. Young's characterization of the products suit as "weak." Jt.App. at 36.

Keystone now argues that the $5 million settlement negotiated between the three products defendants and Keystone does not serve as an accurate benchmark for the later lawsuit pitting BP/Sohio against the products defendants. Keystone contends that BP/Sohio would pursue any shortfall in its recovery from the limitation proceedings in the products action. The products defendants, according to Keystone, would then be bound by the earlier finding of a defect in the limitation proceeding. BP/Sohio, innocent of any fault, could then recover the entire difference from the products defendants who were to be indemnified by Keystone. The district court by order had, however, allowed the products defendants to offer additional evidence on the defect in BP/Sohio's products action. This order demonstrates that the defect had not been conclusively established in the products suit. *B.P. Oil, Inc. v. Bethlehem Steel Corp.*, 536 F.Supp. 293, 296 (E.D.Pa.1982). Therefore, the district court's finding that Keystone's potential exposure to a large judgment in the products suit was minimal cannot be deemed clearly erroneous.

The district court also cited as "circumstantial" evidence the fact that Home was responsible for an additional seven million dollars in coverage above the third excess level. The trial court considered Home's conduct in light of the fact that Home had, through its contracts at the fourth and fifth levels, assumed an appreciable amount of additional risk. Therefore, Home's decision not to accept the proposed settlement did not put the insured at additional risk. Indeed, had the matter continued to trial and a sizeable adverse judgment been returned, it was Home that would have had to satisfy a large portion of the award.

Finally, we note that settlement at $30 million gave BP/Sohio a little more than 80% of its maximum recovery, an amount not unreasonable, but perhaps on the high side.

There is, of course, competing evidence from which a factfinder might draw different inferences. This includes Mr. Young's recommendation of the $30 million settlement. Nevertheless, on this record, we cannot conclude that the district judge's finding that Home's refusal to contribute to a settlement higher than $24.8 million was a reasonable business decision taken in good faith was clearly erroneous.

Accordingly, we will affirm the order of the district court.

Judge Seitz concurs in the result reached by the majority. His conclusion is based on the absence of provisions in the various policies that would be pertinent to this controversy and the presence of critical findings by the district court. He fully recognizes, however, that another approach to the resolution of the dispute would not be unreasonable.